Good morning, may it please the court. Ezekiel Cortez on behalf of Mr. Showalter. I'd like to reserve five minutes for rebuttal if I may. And I'm going to use my outside voice so you can hear me very well. I thought about what to tell the court besides everything that we have already briefed extensively. And I thought about this. What is this case not about? This case is not about a defendant who has a change of heart because he doesn't like the sentence recommendation. This case is not about a defendant who woke up one morning and told his lawyer, you know what, I changed my mind, I want to go to trial just because I want to go to trial. And this case is not about grasping at straws for a defendant who may not have any newly discovered evidence or any other fair and just reason or any other piece of evidence. This is a case that began pre-indictment with the government working in consort with the SEC, hand in glove with the SEC. This is a case where counsel for Mr. Showalter met with the government's attorney, the assistant U.S. attorney in Santa Ana handling the case and the FBI agent. And this is a case, unlike McTiernan, where the FBI agent and the prosecutor assigned to the case assured defense counsel that number one, the government had over 100 victims of fraud who were ready to testify and they had perhaps $15 million, but that was flexible. We could agree to disagree on the amount of loss. And this is a case where the defendant was basically overwhelmingly guilty. When discovery was requested, modest discovery was requested, it was denied. There would be no discovery. The client at the same time was told, if you don't engage in a plea agreement, we're going to indict you with securities fraud, selling securities without a license, and we're going to throw the book at you. By that point, the government's representations to Mr. Showalter through his counsel piggybacked on what the SEC had said publicly. And let me just pick an example of what the SEC said that was material in this case to Mr. Showalter's thinking about being guilty. The SEC said publicly, repeatedly, that Mr. Showalter, number one, had lied to these investors by concealing his prior order from the SEC case to not sell any securities. Number two, that Mr. Showalter was not truly engaged in developing the property that he said to the investors he was developing. It was all a scheme. In fact, that's what the SEC regional director said to the television stations here in L.A. He basically said the whole thing is a Ponzi scheme, he's a fraud, all of this is not true. What do we find six months later? And I believe the court needs to know why we found these things six months later. Was I incompetent? Was co-counsel incompetent? The five people we had working on the case incompetent? Let me tell you what we did. We had investigators contacting every possible investor in this case to speak with us. They declined. Why did they decline? Because they were being coordinated by one principal investor, Mr. Rivas. You saw his name in the record, I hope. And the SEC counsel. And so these people basically said, we're not talking to you, your client's a thief, we don't want to talk to him. The few people that our investigator was able to get to talk to us, those without counsel, stated that basically what they were told by the SEC was a crime. One investor who is key to this case, Earl Coleman, he represents 54 other investors. That one investor was never interviewed by the FBI. What do we find out afterwards, six months later, the second thing? When we finally began to talk to witnesses, when they agreed to speak with us, we find that the government, that is the FBI, the U.S. Attorney's Office, they had interviewed maybe six, maybe seven investor victims. That's it. Nobody else. Especially key people like Mr. Coleman. That fact was corroborated by the assistant in court at sentencing when he said, no, we haven't even talked to any of these people, your honor. By the way, there was no sentencing hearing, as you could tell from the transcripts. So to back up again, how can the government tell a suspect pre-indictment who is proactive, who's saying, okay, you're saying I did all these awful things, what do I do? What do you want me to do? He's talking to the SEC, he's talking to the Assistant U.S. Attorney's Office, he begs to be allowed to work the properties. Because one of the alleged false statements was, he's not really working on properties, this is a scheme. So he says, let me work on the properties under the supervision of the SEC. The answer, no. What did people later tell us six months later? You know, this guy was working the properties. One of the government's own witnesses, Mr. Lang, at sentencing, with a letter to the judge. He tells the judge, when I showed up at the scene, yeah, there was a lot of construction going on, there was a lot of workers going on, and there were things going on. Why is all of this in Mr. Showalter's control? I'm sorry? Why is this not all in his control? I'm trying to figure out what the government did wrong here. I'll tell you. Thank you for that question, Judge Fogle. If you look at the record, there is a declaration from Scott Harmon. Scott Harmon was the principal on-site foreperson, if you will, of the construction sites. Mr. Showalter was traveling around the country working on a cement deal that we mentioned in the paperwork. So that Scott Harmon was left in charge of the actual scene, and another individual at the office to coordinate expenses, employees, everything else. Scott Harmon declared under oath that in his opinion, the reason why these houses begun to fail, because of the economy, was because Showalter was out pursuing the cement deal that he told everyone he was going to work on, and he left someone else behind in charge of the whole operation. And Scott Harmon tells you, one minute we're working, everything's fine, we begin to fall back a little bit because of expenses and such, but then the whole thing is just neglected by the people in the office. When Showalter came back to the scene, he was brought up to speed as to what was going on, he was angry. Let me concede this to the panel. Mr. Showalter is not a nice guy. He's not going to win any popularity contests. He has a very rough personality, alpha type male, and he gets things done. So a lot of people don't like him because of that. But despite that, Harmon tells the district court in a declaration, Your Honor, he didn't intend to rip anybody off. The project was viable. I was there, I was watching it. And then he left, left it in the hands of his managers, and they made it fail. But let me tell you this. Nobody forced him to plead guilty. Absolutely not. I concede, just like in McTiernan, Your Honor. No one forced McTiernan to plead guilty. So what happened between the time of the guilty plea and the time of the motion to withdraw the guilty plea that was not within Mr. Showalter's own cognizance or his own control? There was no outside agency here that prevented him from deciding whether it was worth it to go to trial. And he's an ape personality. Absolutely. Let me tell you what. I'll give you two key pieces of evidence because of our time constraints. One, Earl Coleman, again. The SEC and the U.S. Attorney's Office had alleged publicly that Showalter never told anyone that he had been barred before. Okay? Joe Rebus, the other person. Joe Rebus filed a declaration under oath in the SEC litigation where he said, Showalter never told me about this prior bar from the SEC. That was a big fraud. If I had known that, I never had invested. Earl Coleman files a declaration with the SEC because he wants to intervene in civil action, you see. Why did he want to intervene? Because he and 55 other investors are watching the SEC abandon the properties. There was rain at the time. So suddenly you have properties being destroyed. So Coleman goes and gets a good lawyer, goes to court and says on his declaration, you know, I'm one of the victims of the fraud that the SEC is talking about. I swear here under oath that I'm one of those victims and that I was defrauded by Showalter and files a declaration. That was around the time that he pleaded guilty, Showalter, because that was one of the key pieces of evidence. He says, you see, I have Earl Coleman with 54 other people saying I defrauded him under oath. What do I do? Okay? Fast forward. Now you saw the declaration from Earl Coleman six months later. Through counsel, not through us, through counsel he basically states the exact opposite of what he said under oath to the SEC. And the government pointed that out at sentencing. He tries to eat away at Coleman's credibility, which he's free to do so. Okay? That is one key piece of evidence that wasn't there before. Second, Joe Ribas. Joe Ribas was another leader. In fact, he was the most vocal of these investors, first with the SEC. He tells the court, I was involved from the very beginning with the SEC, pursuing the Showalter guy. He declares under oath, and mind you, this is an alleged fraud case, he declares under oath to the SEC that Showalter defrauded him. And the principal way, because he was a very sophisticated investor and real estate manager, the principal way is that Showalter withheld a critical piece of evidence from Ribas, that is, that Showalter had been barred from the SEC. Fast forward. Because there is a collateral civil lawsuit against Joe Ribas for slander, interferes with contractual rights, what have you, he gets to the point after signing his declaration to the SEC under oath, that is a 1001 statement, as you know, full statement to a government agency. He basically, in a deposition under oath again, when questioned by Showalter's civil lawyer, says to the civil lawyer after he was pushed a little bit, because he didn't admit initially, okay, I did lie under oath in my declaration to the SEC. Because, see, he was confronted with the very document that he signed acknowledging that Showalter had told him. Well, doesn't Showalter know whether he told him or not? Yes, and this is the point. They're declaring under oath the opposite. So what could we do at the time? Call the government's bluff. Begin to hope for discovery, and then see what happens. Let me tell you why he didn't do that, Showalter. You have a bunch, and look at the plea agreement, please, because you will notice a base offense level of 26. You will notice what's called an open-ended plea agreement, and the loss amount was either a million or more or a million or less. Why was that done? Because we were told that the properties were going to be handled by the receiver appointed to work with the SEC. My client and a lot of other people, including Earl Coleman, knew that if Showalter started working the way he had before, where he made money for people like Joe Ribas, that he would take those properties, distressed properties, put labor in them, and immediately you have a $200,000 home in Laguna Miguel going up to about $500,000 or $600,000. They all knew that. And, in fact, that's what later happened, by the way. And so why did Showalter accept the government's plea? He was told this. Number one, we don't feel guilty. We're going to indict you. He wondered, am I going to make bail? If I get indicted, I'm accused of all these awful things. I'm not a nice guy. I have a prior problem. A lot of lawyers that he consulted with pretty much told him, Jasper, bail looked pretty bad. So if I don't get bail and I don't get out there to develop the properties, then what happens? Then everything falls. I'll take my chances. A lot of people plead guilty when they believe they are not guilty. There's no looking tender, please, as you know. Alfred, please. McTiernan, look at McTiernan. The same questions you asked me. This very court pointed out all of these negative facts from McTiernan, including that he was indeed advised by his initial counsel, sorry, regarding the suppression issue. He was told, okay? And this court aptly noted, it doesn't matter whether the motions to suppress will succeed. In this case, it doesn't really matter if Earl Coleman is credible or not. That's up to the jury. So you can see all these parallels as we briefed it out. I'm sorry. I had toe surgery about two months ago. You want to have some water? I already did. Have another glass. We've got lots of them. Good for you. Yes. They removed my uvula and tonsils because I had sleep apnea. And so it gets very dry. But anyway. It hasn't hurt the quality of your voice. Thank you. Thank you. Your very questions provoke you to look at the record. Look at what happened here. For some reason, some guy who's type A with a bunch of lawyers representing him decides to take a plea agreement from the U.S. Attorney's Office. Six months later, it's not that the government tells him, oh, we're going to recommend 20 years for you, Mr. Showalter, which would be okay. That's not what happens. What happens is the people that told him before, you cannot count on us, even if you subpoena us, you cannot count on our help. We're going to bury you. What happened was just the opposite. So why? Why was the change? I'll tell you why the change. The investors, whether they be greedy or not, let's say it, lost faith in the SEC lawyers. They lost faith in the court's receiver. They lost faith in the process. That's when they became angry and started telling the truth. And let me put it to you this way. As we're sitting there in front of Judge Guilford, we lawyers were prepared to cross-examine witnesses. We expected the government, very aggressive prosecutor, very good prosecutor, we expected the government to bring Earl Coleman, to bring Jamia Sherman, to bring Scott Harmon and everyone, put them on the witness stand and do their thing. This is what they did. Well, you know what they did. They didn't cross-examine a soul. On the matter of how many people were victims, was it more than 100, less than 100, there was no witness put on the witness stand by the government. The court, the district court, simply looked at counsel for the government and asked, have you proved your case with enough evidence? In essence, I'm paraphrasing. And the government lawyer says, yes, I have, Your Honor. That's the extent of the hearing. But here's the key for sentencing and for what's something new. Earl Coleman represents 55 people, 54 in himself. That's 55 people. The pre-sentence report puts in that there were 110 victims, although acknowledges that Coleman called the probation officer and tried to tell him what was going on. So if you subtract 55 people from 110 people, that would reduce the amount of potential loss to at least by 50% or 48%. What happened here was very simple. This is not a flood case issue. You're not going to have all these defendants saying, oh, because of McCune and Showalter, I want to withdraw my guilty plea. I've been in practice for 26 years. This was my first motion to withdraw, my very first motion to withdraw, with good reason. Most people would be foolish to do that. So why does Showalter ask this court now to let him be foolish? All he's asking, unlike McTiernan, who was asking for suppression of the tape by Pelicano, a key piece of evidence, Mr. Showalter's not asking for suppression of anything at this point. He wants to go to jury trial. Why? Because he wants the whole truth to come out. Of what he was charged, he is not guilty. Of what he was charged, he is not guilty. And we have witnesses to say that at their peril. Why would Earl Coleman risk being prosecuted by a very vigorous U.S. attorney's office to put himself on the line, acknowledging that he had lied to the SEC under oath? Why would he do that? I think I have two minutes left. I'll resume. Good morning, Your Honors. I am Assistant United States Attorney Mika B. Civil on behalf of the government this morning. I would like to go directly to the heart of what a government perceives defendants' primary focus in the briefing and in this morning's argument to be. And that is why the declarations the defendant proffered in support of his motion to withdraw his guilty plea do not constitute a fair and just reason, do not constitute newly discovered evidence that justifies withdrawal of his guilty plea. First of all, as the district court ---- All right. Now ---- All right. Go ahead. Yes, Your Honor. First of all, as the district court noted and relied upon in its order denying defendant's motion to withdraw his guilty plea, the defendant knew all three of the declarants whose testimony he now offers to the court as newly discovered evidence. Mr. Harmon was a contractor who worked for Mr. Showalter at Mr. Showalter's business Hyde Park Investments. Mr. Miyashiro was one of the investors in the defendant's business, fraudulent scheme. The two had known each other for at least three years since 2003. Mr. Coleman, who Mr. Cortez has spoken of a lot this morning, was one of the defendant's largest investors, in fact, invested $900,000 in the defendant's scheme. And the two had met at least three times over the course of their business relationship, obviously well before defendant pled guilty here. Now, counsel for defendant even conceded at the hearing in the district court on his three declarants were, but that he knew the substance of what they would say. And as the court has heard this morning, what seems to be the emphasis of the defendant's argument is not that he didn't know who they were or that he didn't even know what they would say, but that they were somehow unavailable to him because they were pursuing the civil fraud action against defendant or because their lawyers were somehow shielding them from the defendant. And I think the most important thing to note in response to that argument is that the defendant has a right to compel witnesses to testify on his behalf. And in the district court's very thorough plea colloquy with the defendant, the district judge advised the defendant of that right, and the defendant chose not to avail himself of the ability to compel those witnesses to testify. And now, given one can never know whether a witness will testify truthfully if called to testify at trial, but neither do I or any prosecutor ever know whether a witness will comply with their obligations to be truthful on the stand. The point is the defendant had the right to compel those witnesses on his behalf. Moreover, with respect to the substance of what those declarants proffer as far as testimony, the testimony that they proffer merely could not plausibly have motivated a reasonable person in defendant's circumstances not to plead guilty. Taking them one by one, Mr. Miyashiro initially stated that he believed investor funds provided to the defendant were being properly used. He later retracted that statement in a declaration submitted and said that he, in fact, doesn't know how investor funds were used. Can I just interrupt you for a few minutes? Yes, Your Honor. Now, the district court enhanced Showalter's sentence for 50 or more victims. Yes, Your Honor. Okay. And so this produced a sentence that was, what, at least 16 months longer than would have been required under the guidelines? I believe, Your Honor, that the difference in the victim calculation added a plus two to the defendant's sentence, and I am not certain of what time. Yeah, well, that's what I'm figuring on. Yes. About 16 months more. Now, did the government prove by a preponderance of the evidence that there were more than 50? Yes, Your Honor, I believe that it did. What was the ñ Showalter, he repeatedly objected to the PSR's factual allegation that there were 50 or more. He objected to that, right? Yes, Your Honor, he did. And then his sentence, though, nonetheless, was enhanced for 50 or more. And from what I can tell, that was based solely on a brief telephone conversation with the bankruptcy trustee that's mentioned in the PSR. Your Honor, I believe that the probation officer who prepared the PSR considered multiple pieces of evidence and information. Those included investigative reports received from the SEC pertaining to their investigation of the defendant. The probation officer spoke with the bankruptcy trustee as well as an SEC trustee. And I would also note that with respect to the number of victims, the defendant's primary objection seemed to be that victims, some of the victims who were included in the probation officer's calculation, shouldn't be counted because they didn't consider themselves to be victims. And now that objection holds no weight because this Court has held in United States v. TAP that the point of the sentencing guidelines provision concerning the number of victims is to measure the severity of a sentence in part by the number of persons ensnared in the scheme and that it doesn't matter whether those people subjectively consider themselves to be victims. Okay. Now, we have this list here of victims. Yes, Your Honor. It runs, what, over two pages? Yes, Your Honor. There are 117 people on that list. 117. Now, who generated that list? Your Honor, I don't know who generated that list, but I know that it's based on the information that the probation officer obtained from the materials that he reviewed. Well, did the probation officer get this list from the trustee? Yes, Your Honor. I believe that at least the information came from the trustee. But we don't know that, do we? Do we know we got it from the trustee? I know the information is what the probation officer learned from the trustee. I don't know who generated that actual list. But I think what's a key piece of information with respect to that list is that every one of the people on there, at the time that the probation officer prepared the PSR, none of those people had recovered any of the money they had invested with the defendant. Therefore, they suffered actual loss within the meaning of the guidelines. Moreover, Your Honor. How did the district court verify the list? Your Honor, I believe aside from the lengthy arguments, the court heard two lengthy arguments about this. There were also victim letters submitted to the court that the court considered. There were also several victims who spoke at the sentencing hearings and corroborated the fact that they had invested particular amounts of money in defendant's fraud. Moreover, Your Honor, the government did make that trustee available at sentencing for cross-examination, and the defendant did not take advantage of the opportunity to cross-examine him. So we really don't know who generated this list? Your Honor, I don't know who actually created the list, but I do know that the information came from the trustees and from the investigative reports. So how do you know this? I know that from reviewing the record, Your Honor, and there's reference to the things that were considered. But I have not spoken with the probation officer. So you didn't ask the probation officer, where did this list come from? Your Honor, I did not. But all of those people ---- But the burden is on the government to prove the accuracy of the list. Well, Your Honor, the burden is on the government to show by a preponderance of the evidence that there were more than 50 victims. And how did the government do that? Well, Your Honor, by ---- it is appropriate for the district court to rely on hearsay contained in a PSR. And the PSR includes input from the SEC trustee, from the bankruptcy trustee, and from some of the victims themselves. Is that in the PSR, all this information? Yes, Your Honor, it is. The source of this? I believe the PSR contains reference to speaking to the trustee. Do we know how the trustee came up with this list? Your Honor, only in as much as the trustee was working closely with the defendant to handle the bankruptcy of Hyde Park Investments. And, in fact, the defendant conceded, you can see in the government's excerpt of record at page 82, that the defendant conceded that the bankruptcy trustee knew the financial arrangements in the case. And the bankruptcy trustee even worked with the defendant's civil lawyer to prepare the bankruptcy for Hyde Park. So it suggests that the bankruptcy trustee was reliable, was receiving information from multiple sources in preparing this information for the district court. Moreover, it is appropriate for the district court to consider hearsay at sentencing as long as there is even a minimal indicia of reliability, which I think there is here given defendant's relationship with the trustee, given the trustee's ---- Your Honor, the sentencing judge noted that he relied on arguments heard at both extensive sentencing hearings. He relied on the PSR, and there was also a subsequent addendum to the PSR. He relied on voluminous victim letters that probation received. He relied on the statements of several victims who spoke at both of the sentencing hearings. So, Your Honor, he had heard quite a bit of evidence and quite a bit of argument at this point when he decided that defendant ---- Well, did he tell us how he came up with that figure, 117? Your Honor, he explained that he relied on all of these things, and he made a short explanation finding that he agreed with the number of victims. And to be clear, just to note as well that the guideline level that the court selected was that it was more than 50 victims. So the court would have had to have been wronged by at least 67 people not to reach that threshold. But we don't know how ---- where these names came from. Well, Your Honor, we do know that they came from the bankruptcy trustee's investigation and work with the defendant in preparing the bankruptcy of defendant's company, Hyde Park Investments. And the court has upheld reliance on this sort of ---- Well, you're speculating on that, aren't you? I believe the record makes clear that the trustee worked with the defendant on the bankruptcy processes and that he is the one who provided that information to probation. So you're saying that Ameline has been satisfied and that the district court relied on more than the PSR to establish that there were more than 50. Your Honor, I think that the district court did rely on more than merely the PSR. He also had and stated in the record that he relied on voluminous victim letters that corroborated the information contained in the PSR and also on the victim statements that were provided orally at both of those hearings. Well, how many victim letters did he receive? Your Honor, the record indicates that the court said that he considered voluminous victim letters. I do not know how many letters he received, but the district court described them as voluminous. And several victims spoke at the hearings. My recollection from reading the record is that it may have been in the neighborhood of 7 to 12 victims. Well, under Ameline, which was an in-bank decision of the court, our court, we've stated that the district court may rely on undisputed statements in the PSR at sentencing. However, when a defendant raises objections to the PSR, the district court is obligated to resolve the factual dispute, and the government bears the burden of proof. Yes, Your Honor. And I think here defendant's objection, his primary objection to the victim calculation was that the people, that some of these victims did not consider themselves to be victims. That was the only objection he offered with respect to why that calculation was wrong. Therefore, if the only basis for his objection was that some of the people no longer considered themselves to be victims, then under the guidelines, that's beside the point. You're saying he didn't raise any objection to the list per se, say that list is inaccurate or those people don't exist or didn't make claims at one time. Right. But some of them don't consider themselves victims. I think the defendant did raise the objection that the information was based on hearsay, but the defendant did not take advantage of the opportunity to cross-examine the trustee who was present in court that day. All right. Go ahead. Okay. So additionally, with respect to sentencing, I'll move back to the motion to withdraw unless the court has additional questions about the loss amount. Okay. Briefly moving back to the motion to withdraw, I would focus briefly, for example, on Mr. Coleman, who I think of all three of the declarants the defendant proffers, perhaps the defendant makes the most of Mr. Coleman's testimony. And as Your Honor pointed out during the defense counsel's arguments a moment ago, the government's position with respect to Mr. Coleman's inconsistencies in his statement in the initial SEC complaint as compared to his declaration provided in support of defendant's motion is really that whether the defendant did or did not tell Mr. Coleman that he was guaranteed a particular return is something that the defendant knew before he pled guilty. He knew whether he had told Mr. Coleman or any of the investors that they would get a certain return. Therefore, again, defendant had the right to compel these witnesses to testify as to that at trial. Finally, briefly to touch on McTiernan, the defendant, this has been briefed extensively, but I would like to make a couple of brief points on that case, the first of which is simply that McTiernan does not, it's not relevant to defendant's appeal. McTiernan is a case about whether inadequate legal advice constitutes a fair and just reason to withdraw a guilty plea, and McTiernan reaffirmed this court's holding in United States v. Davis that in fact inadequate legal advice can constitute a fair and just reason. Defendant here does not contend that he received inadequate legal advice or that he falls under this other category of a basis of a fair and just reason. He falls in the argument of I have newly discovered evidence, and he simply cannot carry his burden and did not carry his burden, which the case law is clear he has a burden, to establish that he has a fair and just reason. What McTiernan, the burden of proof that I think defendant points to as far as the district court holding him to too high of a standard, went to whether defendant in McTiernan, whether his fair and just reason could plausibly have motivated him not to plead guilty. The court said that the district court should not have been considering the merits of his motion to suppress and therefore held him to too high of a burden, but here the district court was not considering that wrong. The district court was only considering whether defendant had met his burden in the first place of establishing there was newly discovered evidence. It determined that he did not. The district court was within its discretion to do that. Yeah. I see you're 5 minutes and 28 seconds over. Probably a lot of it is attributed to my questions. I apologize, Your Honor, and I actually do submit. I am finished unless the court has additional questions. Thank you. My timing is always perfect. Are you at the Santa Ana courthouse? Yes, Your Honor, I am. Okay. Counsel just told you and confirmed what you have in the record about the voluminous victims and voluminous letters. A little over 10, less than 20. And it's in the presentence report. We don't have to ask counsel for the government. It says right there, noted by the probation officer, each investor who wrote a letter. Was there any objection other than a generic hearsay objection to the list that Judge Pegerson was asking about? Yes, Judge Fogel. What was the objection? If you look, the objections were, not objections singular, unreliable information, unreliable hearsay information, unreliable financial data compilation. We objected to the list of investors specifically twice, at the first sentencing hearing and the second sentencing hearing. No statement that those people aren't investors? Absolutely. There wasn't? Absolutely. That's why the district court noted of its own accord that the defense had vigorously and repeatedly objected. All you have to do is look at the record and our supplemental sentencing materials. It's clearly outlined. Now let's talk about Joseph, the bankruptcy trustee. Yes, we had worked with Joseph, the bankruptcy trustee. That's how we knew the material was highly reliable. Have you just said that there are names listed as victims, people who were never investors? No. What I said was that compilation of names, your question touches on a very key point. We don't know who compiled that list. We believe it was the SEC because we saw three different lists floating around. So we don't know who prepared it. That's why we objected to it. Yes, the government brings bankruptcy trustee Joseph and asks, do you want to cross-examine him? No, we don't. We objected to his conclusions and we object because the government had the burden. And we told the court, Your Honor, they have the burden. They have to prove this. But again, they relied upon roughly, I would even be generous, 15, 15 victims who showed up to court. But let me tell you something significant about that because it's in our paperwork. And you're saying that the voluminous letters amounted to, what, 10 to 20? 10 to 20, Your Honor. And again, the probation officer notes that. But let me tell you about the 10 to 20 because it's a critical fact that has not been discussed yet. It's in the record. They are represented by a lawyer that is very aggressive. And he kept a lot of contact with the U.S. Attorney's Office. I sent letters to this U.S. Attorney in the case warning him about the cross-pollination with his civil lawyer. As it turns out, Your Honors, one of the homes that belonged to the project first that was abandoned by the bankruptcy trustee was purchased by the lawyer for $1. He now lives in it. It's in our paperwork. So there's a reason why this lawyer brings these witnesses to court to testify. And again, it's in the paperwork. So to this day, to this day, there is a civil lawsuit against Mr. Showalter, against his former company, and to this day, and counsel for the government knows this, I have received threats repeatedly that I'm going to be sued because I'm somehow involved in something by this very lawyer. That hasn't been discussed here, but the district court knew about it. And we told the district court, please do not rely on this group of investors facially, Your Honor. Let's have a hearing. And we pointed to the district court at one in particular, Joseph Riddes. Just look at the documents, Your Honor. And we solved the dispute. The issue here for sentencing purposes, as you know, was there an objection to apparently unreliable evidence? The answer is yes. We know what we're supposed to do when you have an objection, and it's a disputed material fact for sentencing. The district court has to resolve it by a preponderance with reliable evidence. They can use hearsay if they want, triple, quadruple, but it has to be reliable. That never happened. Finally, the motion to withdraw doesn't rely upon one basis as we briefed it over and over again. It relies on several bases. Joe Riddes' declaration proved to be false. The homes that were supposedly a scheme were not, to the point where the lawyer representing the group of investors ends up living in one of them. So it's not just one of the declarations from Merrill Coleman, but even if you reduce it to one, which I say you cannot, look at Merrill Coleman again. And please look at it. It's logic one-on-one. One day he's with the SEC telling Sean Walters, subpoena me, go ahead, and I will side with the SEC and say that you defrauded me. In other words, I won't lie, Sean Walters. Go ahead, subpoena me, I'll bury you. That's what was told to us. Later, when Coleman sees that his best interests were not laying in bed with the government, the SEC part, then he comes out of the woodwork, through his lawyer, and tells us who he is. What did you say? Laying in bed with the government? Yeah, it's a matter of speech, I take it. No, it's lying in bed with the government. Indeed, you are correct. Chickens lay. Chickens lay. Both meanings lie. Lawyers lie. Indeed, you are correct. I stand corrected. Look at his second declaration. The government tells you this. This is logic 101. It was always available. It's not newly discovered. The government said declaration A, before guilty plea, said A. Declaration B, after guilty plea, says B, the opposite. That's newly discovered. Thank you. So the lawyer for a group of investors took advantage of an opportunity, you're saying, to buy a house for $1. Check with the State Bar. You made that point earlier. Oh, you got to do it. What's his name? You want to tell him? I don't know. Bruce Douthit. Who? Bruce Douthit. Bruce Douthit? I'm living up to his name. All right. Thank you. Thank you. Okay. I guess that's it. We'll adjourn.
judges: Pregerson, Thompson, Fogel